### A08A0015. LEWIS v. THE STATE.
(663 SE2d 721)

BERNES, Judge.

Robert William Lewis was convicted of voluntary manslaughter, aggravated assault, two related counts of possession of a firearm in the commission of a crime, and unlawful possession of a sawed-off shotgun. The trial court subsequently denied his motion for new trial. On appeal, Lewis contends that the trial court erred by denying his motion for a directed verdict of acquittal because there was insufficient evidence to convict him; refusing to charge the jury on the law of justification and the related principle of "no duty to retreat"; refusing to allow testimony by third parties as to prior violent acts by the victim; and allowing the state to waive its closing argument until after he presented his closing argument. We affirm appellant's conviction for the unlawful possession of a sawed-off shotgun. However, because the trial court erred in declining to charge the jury on justification and "no duty to retreat," we reverse appellant's convictions for voluntary manslaughter, aggravated assault, and two counts of possession of a firearm in the commission of a crime, and we remand for a new trial on those counts.

The evidence reflects that appellant met the victim in 2003. Their friendship grew into a romantic relationship a few months later, and the victim moved in with appellant. But, according to appellant, their relationship began to falter as the result of the victim's "spells" — episodes where she would "go from just calm and sweet to just uncontrollable" and would become violent. Appellant testified that the victim suffered from bipolar disorder and did not take her medication correctly. Appellant further testified that the victim told him that she had shot and killed her first husband, resulting in her serving eight years in a Florida prison.

The romantic relationship between appellant and the victim ended in May 2004 after the victim had one of her spells and appellant informed her that he "[could not] deal with this" and that she would need to move out of his home. Nevertheless, appellant and the victim remained close friends, with appellant driving the victim to doctor appointments, frequently speaking with her on the phone, and offering her a place to stay temporarily while she dealt with an issue involving her son.

The victim spent July 4, 2004 with appellant and his family. Shortly after midnight, appellant went to his bedroom to lie down. The victim came into the bedroom and asked appellant to drive her to her cousin's house, but appellant refused to do so because of the late hour. A fight ensued. Minutes later, appellant shot the victim in the forehead at an approximate distance of nine inches, killing her instantly. After the shooting, appellant called his mother, who lived across the street. At trial, his mother recounted the call from appellant:

> He called me, I don't know what time it was. I had already gone to sleep, and he said, "Mama, call 911; I've shot [the victim]." And I said, "Oh, Lord, no Bobby." I said, "What in the world." He said, "She was trying to kill me." And I said, "Okay, hang up and I'll call."

After calling 911, the mother walked over to appellant's home, where she observed that appellant had some injuries to his left arm and was bleeding. When she got there, appellant was on the phone with a 911 emergency dispatcher waiting for the police to arrive.

Investigators arrived at the home and located the victim in the master bedroom on the floor in the 28-inch space between the wall and a queen-sized waterbed. The victim was found on her knees, with her back toward the wall, and with a "silver dagger-type knife" on the floor behind her right thigh near her right foot. A stereo speaker wire was stretched across her body with the speaker sitting on the floor on her left side.

The firearm that fired the fatal shot — later identified by the state's ballistics expert as a double-action "Harrington & Richardson .410 shotgun" with a sawed-off barrel — was found on the headboard of the bed along with a box of ammunition. Investigators also located the empty sheath for the dagger in the living room on the floor.

Following the investigation, appellant was arrested and charged with felony murder, voluntary manslaughter, aggravated assault, three related counts of possession of a firearm in the commission of a crime, and unlawful possession of a sawed-off shotgun. At the subsequent trial, the state and appellant presented very different

versions of what had transpired in the early morning hours of July 5.

The state argued that a fight had occurred between appellant and the victim, which ended when appellant was able to overpower the victim and force her to her knees beside the waterbed. According to the state, appellant then shot the victim at point blank range while she was on her knees, unarmed and helpless. In support of its position, the state relied on appellant's statement to his mother following the incident to establish that appellant had shot the victim.[1] The state also presented evidence that appellant was much larger than the victim in height and weight, that the firearm used to shoot the victim had to be manually cocked prior to discharge, and that the safety on the firearm was functioning properly. And, most critically, the state relied upon the testimony of an expert in blood stain analysis. The expert opined that based on the location and pattern of the blood spatter at the crime scene, the victim's body would have been in the same or nearly identical position at the time of her death as when she was found by investigators — on her knees and unarmed, with the knife on the floor behind her.

In contrast, appellant contended that the firearm he was holding accidentally discharged while he was defending himself from the victim. Appellant testified that after he refused to take the victim to her cousin's house, the victim left his bedroom and he began to drift asleep. He recounted that, as he was falling asleep, he could sense that the victim had come back into his bedroom. He opened his eyes to find the victim leaning over him on the waterbed, with her hands on a loaded firearm that he kept on his headboard. Appellant testified that after a brief struggle, he pulled the firearm away from the victim and placed it back on the headboard. The victim then went over to the bedroom closet, grabbed a rifle that was inside, and attempted to fire it. According to appellant, he snatched the rifle and told the victim to go back into the living room and calm down. The victim initially complied.

Appellant testified that a few seconds later, the victim came running down the hallway toward his bedroom with a dagger-like knife in her hand. Appellant attempted to shut the bedroom door, but the victim forced the door open. Appellant, who contended that his strength, coordination, and balance were hobbled by an old motorcycle wreck, lost his balance and fell back from the door. The victim entered the bedroom and began "slashing crazy with [the] knife" at appellant. According to appellant, the victim then looked toward the

---

[1] During the trial, the state also introduced and played for the jury an audio tape of appellant's call with the 911 dispatcher. In its brief, the state refers to an incriminating statement on the tape. We have reviewed copies of the audio tape transmitted to this Court, but have not discerned the inculpatory statement to which the state refers.

firearm that appellant had placed back on the headboard, said "I'll kill you now," and started toward the firearm. Appellant stated that in response, he lunged onto the bed and grabbed the firearm. Appellant described what happened next:

> I pulled the gun in, and I looked up, and she was standing there with the knife, you know, and I throwed my left hand up. I was going to grab her arm, but I don't think I ever even got to grab it. . . . I hit it, and knocked her back. About that same time, me lunging for her arm on that water bed, I just about fell and I had to catch myself. . . . [T]hat's when she grabbed the gun. . . . I mean she just snatched hard as she — she's just laying back, just snatched on the gun, and when she snatched, it just snatched me forward too, and the gun went off.

On cross-examination, appellant elaborated that after he lunged onto the bed and grabbed the firearm, he tried to use his left hand to ward off the victim's knife attack, at which point they both lost balance, with the victim falling backward and down into the corner while appellant fell toward the victim. He testified that in that motion, the victim grabbed the barrel of the firearm, pulling the barrel toward herself as he continued to hold onto the firearm, and as "[s]he pulled it, . . . that's when it went off." Appellant further testified that although he "had no desire ever to see any harm come to [the victim]," he had been scared for his life when he grabbed the firearm from the headboard, and when the firearm discharged as the victim pulled on the barrel, he was holding the firearm in his right hand with his middle finger "in the trigger hole."

After hearing all the evidence, the jury acquitted appellant of felony murder and the related count of possession of a firearm in the commission of a crime. The jury convicted appellant of the remaining offenses.

1. Appellant contends that the trial court erred in denying his motion for a directed verdict of acquittal. In analyzing this contention, we are mindful that

> [t]he standard of review for the denial of a motion for a directed verdict of acquittal is the same as that for reviewing the sufficiency of the evidence to support a conviction. A motion for a directed verdict in a criminal case should only be granted when there is no conflict in the evidence and the evidence demands a verdict of acquittal as a matter of law. Moreover, on appeal the evidence must be viewed in the light most favorable to the verdict, [appellant] no longer

enjoys the presumption of innocence, and the appellate court determines the sufficiency, not the weight of the evidence, and does not judge the credibility of the witnesses.

(Citation and emphasis omitted.) *Howard v. State*, 281 Ga. App. 797, 800 (3) (637 SE2d 448) (2006).

(a) Appellant argues that there was insufficient evidence to convict him of voluntary manslaughter,[2] aggravated assault,[3] and the two related counts of possession of a firearm in the commission of a crime.[4] His sole argument in this regard is predicated on the rule enunciated in cases like *Terry v. State*, 243 Ga. 11, 12-13 (1) (252 SE2d 429) (1979),

> that where the [s]tate must rely upon the defendant's admission alone for an essential element of its case, and where the defendant's inculpatory statement is coupled with exculpatory matter . . . , the jury may not, in convicting the defendant, accept the inculpatory statement and reject the exculpatory matter.

*Price v. State*, 108 Ga. App. 581, 585 (5) (133 SE2d 916) (1963). See also *Wall v. State*, 5 Ga. App. 305, 308 (4) (63 SE 27) (1908). Appellant contends that the state had to rely upon his statement to his mother following the shooting and his testimony at trial to prove that he was the person who fought, shot, and killed the victim; the state presented no other evidence to establish this essential point, such as third-party witnesses, fingerprint evidence, or gunpowder residue on appellant's hands. As such, appellant argues that because his statement to his mother and trial testimony were coupled with his exculpatory explanation that the victim was trying to kill him and that the firearm discharged accidentally, the jury was not permitted to accept the inculpatory part of his statement and testimony that he had shot the victim, but at the same time reject the

---

[2] OCGA § 16-5-2 (a) provides that a defendant is guilty of voluntary manslaughter if "he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person."

[3] A defendant commits an assault if he "[a]ttempts to commit a violent injury to the person of another" or "[c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury." OCGA § 16-5-20 (a) (1), (2). If the defendant commits the assault using a deadly weapon, he is guilty of aggravated assault. OCGA § 16-5-21 (a) (2).

[4] A defendant is guilty of possession of a firearm in the commission of a crime if he has a firearm on or within arm's reach of his person during the commission or attempted commission of "[a]ny crime against or involving the person of another." OCGA § 16-11-106 (b) (1). If the defendant's conviction on the underlying crime is reversed, then his conviction for the possession of a firearm during the commission of that crime must likewise be reversed. See *Carter v. State*, 265 Ga. App. 44, 53 (6) (593 SE2d 69) (2004).

exculpatory part. Thus, according to appellant, if the jury rejected his testimony as not being credible, it had to reject all of his testimony, leaving no evidence that appellant was the person who fought, shot, and killed the victim, requiring an acquittal. Conversely, appellant argues that if the jury credited his testimony, the jury nevertheless was required to acquit him because it had to accept his exonerating explanation of what had occurred.

We are unpersuaded under the circumstances of this case. The rule set out in cases like *Terry* does not apply where the state presents other direct or circumstantial evidence that contradicts the exculpatory part of the defendant's statement or testimony. See *Edwards v. State*, 271 Ga. 3, 4 (1) (514 SE2d 833) (1999); *Terry*, 243 Ga. at 12-13 (1); *Price*, 108 Ga. App. at 585 (5). In such a case the jury is authorized "to believe certain parts only of the defendant's statement while rejecting other parts, and to combine the parts of the statement thus believed with the evidence of facts and circumstances which they believe in order to arrive at a logical verdict." (Citations omitted.) *Price*, 108 Ga. App. at 585 (5). Thus, if the state presented evidence that contradicted appellant's exonerating explanation that he accidentally shot the victim while she was attempting to kill him, the jury was free to accept appellant's incriminating admission that he shot the victim, reject the exculpatory part of his testimony, and combine his incriminating admission with the other evidence presented by the state to arrive at a verdict of guilty. See id.

Here, the state did present circumstantial evidence that contradicted appellant's exonerating explanation of what had occurred. As noted above, the state presented evidence that appellant was much larger than the victim and that the firearm used to shoot the victim had a functioning safety and had to be manually cocked prior to being fired. The state also elicited testimony from an expert in blood stain analysis that based on the blood spatter evidence at the crime scene, it was his expert opinion that the victim was in the same or nearly identical position at the time she was shot as when investigators found her, namely, on her knees and unarmed. It is true that the expert never visited the crime scene and conceded that the photographs he based his blood spatter analysis on were not of the quality he would have liked, since they were not properly taken to scale and were not taken at right angles. Nevertheless, these were factors that went to the weight and credibility of the expert's testimony, which were for the jury to decide. See *Combs v. State*, 268 Ga. 398, 399-400 (500 SE2d 328) (1997). Accordingly, we conclude that the evidence introduced by the state contradicted appellant's version of the incident and authorized a reasonable jury to find appellant guilty beyond a reasonable doubt of voluntary manslaughter, aggravated assault, and the two related counts of possession of a

firearm in the commission of a crime. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Beck v. State*, 273 Ga. App. 363, 365 (1) (615 SE2d 168) (2005). See *Edwards*, 271 Ga. at 4 (1); *Terry*, 243 Ga. at 12-13 (1); *Price*, 108 Ga. App. at 585 (5).

(b) Appellant further contends that there was insufficient evidence to convict him of unlawful possession of a sawed-off shotgun under OCGA § 16-11-122. A "sawed-off shotgun" is defined as "a shotgun or any weapon made from a shotgun whether by alteration, modification, or otherwise having one or more barrels less than 18 inches in length or if such weapon as modified has an overall length of less than 26 inches." OCGA § 16-11-121 (5). In turn, "shotgun" is defined in OCGA § 16-11-121 (6) as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." According to appellant, the state failed to present evidence that the firearm that was used to shoot the victim was originally a shotgun, because the state's expert did not specifically opine that the firearm was originally designed "to be fired from the shoulder." OCGA § 16-11-121 (6).

We disagree. There was testimony at trial from which the jury could reasonably infer that the firearm at issue was originally designed to be fired from the shoulder but had been modified into a pistol-like configuration. Pertinently, the state elicited testimony from a firearms identification and ballistics expert that the firearm at issue had been modified from its original specifications in that "the stock of the firearm had been cut off, and a piece of innertube [had been] placed over the grip to make it into a pistol grip configuration." The expert further opined that the gun barrel "appeared to have been cut off and slightly refinished, rounded off where the jagged edges would have been," and currently had a barrel length of eight and a half inches and an overall length of fourteen and three quarter inches. The expert also testified that the ammunition used in the firearm was of the gauge normally used in a shotgun. Finally, the expert testified that based on the make and model number of the firearm and his review of different firearms catalogues and an online firearms database, it was his conclusion that the firearm at issue was originally a "Harrington & Richardson .410 shotgun." Given this expert testimony, we conclude that a rational jury could have found appellant guilty beyond a reasonable doubt of the unlawful possession of a sawed-off shotgun. *Jackson*, 443 U. S. 307. See *Wiley v. State*, 204 Ga. App. 881, 881-882 (2) (420 SE2d 783) (1992).

2. Appellant filed written requests to charge on justification (self-defense),[5] the related principle of "no duty to retreat,"[6] and accident.[7] Over his objection, the trial court charged the jury on accident but refused to give charges on justification and "no duty to retreat." Appellant argues that the trial court committed reversible error by refusing to give these two charges. We agree.

A defendant is entitled to a jury charge on a subject as long as there is slight evidence to support it, and whether the evidence was sufficient to warrant the charge is a question of law. *Buice v. State*, 281 Ga. App. 595, 598 (3) (636 SE2d 676) (2006). "Generally, either accident or self[-]defense will be involved in a case, but not both. This is because they are for the most part mutually exclusive, in that self-defense involves an intentional act and accident does not." (Citation and punctuation omitted.) *Payne v. State*, 273 Ga. App. 483, 487 (7) (615 SE2d 564) (2005). Significantly, however, the Supreme Court of Georgia has held that a trial court should charge the jury on both accident and justification "where one who is armed with a weapon claims it accidentally discharged while he was defending himself from another party." (Citation omitted.) *Koritta v. State*, 263 Ga. 703, 704 (438 SE2d 68) (1994). See *Turner v. State*, 262 Ga. 359, 360-361 (2) (b) (418 SE2d 52) (1992). That is precisely the situation in the present case. As previously noted, appellant testified at trial that the victim was attempting to stab him with a knife, that he was scared for his life and had his finger in the trigger hole of his firearm, that the victim reached for the firearm, and that the firearm discharged when appellant fell forward holding the firearm and the victim grabbed hold of the barrel and fell backward. Indeed, appellant's account of what happened is strikingly similar to the defen-

---

[5] The defense of justification is defined in OCGA § 16-3-21 (a):
A person is justified in threatening or using force against another when and to the extent that he . . . reasonably believes that such threat or force is necessary to defend himself . . . or a third person against such other's imminent use of unlawful force; however, . . . a person is justified in using force which is intended or likely to cause death or great bodily harm only if he . . . reasonably believes that such force is necessary to prevent death or great bodily injury to himself . . . or a third person or to prevent the commission of a forcible felony.

[6] Under Georgia law,
[o]ne who is not the aggressor is not required to retreat before being justified [in] using . . . such force as is necessary for personal defense or in using force which is likely to cause death or great bodily harm, if one reasonably believes such force is necessary to prevent death or great bodily harm to himself or to prevent the commission of a forcible felony.
(Citation and punctuation omitted.) *Bracewell v. State*, 243 Ga. App. 792, 794 (2) (534 SE2d 494) (2000).

[7] OCGA § 16-2-2 defines the defense of accident: "A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence."

dant's testimony in the *Turner* case, where the Supreme Court held that the trial court should have charged on both justification and accident:

> (S)he jumped at me with that knife just like that. And I was lucky enough to catch her hand. And what happened, she dropped the knife and when she dropped the knife, she went . . . the gun . . . she had hold to the gun with this hand all the time, and she get the gun and the gun went off. That's the way she got shot. I didn't shoot her down. I didn't even try to hurt her. Everything I did was tried to help her.
>
> . . . .
>
> I turned around, and she had the knife just like that and I caught her like that, and . . . she caught the gun. She caught the gun. She dropped the knife, she went just like that and when she threw that gun, I tried to get the hand off and that's when the gun went off.

*Turner*, 262 Ga. at 359-360 (2) (a). As such, appellant was entitled to a jury charge on justification. See *Koritta*, 263 Ga. at 704-705; *Turner*, 262 Ga. at 360-361 (2) (b).[8]

Likewise, appellant was entitled to a charge on the related principle of "no duty to retreat." If the defense of justification is raised in the case, and the related issue of retreat is raised by the evidence or put in issue, the defense is entitled to a charge on the principles of retreat upon written request. See *Jackson v. State*, 237 Ga. App. 746 (516 SE2d 792) (1999). After the trial court had announced that he would not charge the jury on justification and "no duty to retreat," and after appellant had argued his case to the jury, the state suggested in closing argument that in deciding whether to convict, the jury could consider the reasonableness or unreasonableness of appellant's failure to lock himself in his bedroom after the victim initially attacked him and had left the bedroom, a point that the state had previously highlighted during the cross-examination of appellant. The state argued:

---

[8] In his dissent in *Koritta*, Justice Carley joined by two other justices argued that a charge on both accident and justification "should be limited to the 'rare' case wherein there is evidence that a shot was fired as the *accidental* result of an actual *on-going* defensive struggle over *control* of a gun." (Emphasis in original.) *Koritta*, 263 Ga. at 706 (Carley, J., dissenting). The "rare" case to which Justice Carley and his fellow dissenters referred is presented here based on appellant's testimony.

> Now, when we just [had] our life threatened with a .410 shotgun and when we have a woman who has just tried to make another rifle work with the intent to harm us, we don't even close the door. But had we elected to close the door, he's got a dead bolt on his bedroom door, push, turn. All he had to do. . . . But Bobby said this day he didn't do anything.

Accordingly, because the defense of justification was raised by the evidence, and the state placed the issue of retreat before the jury, the trial court erred in not charging the jury on the principle of "no duty to retreat." *Johnson v. State*, 253 Ga. 37, 38-39 (315 SE2d 871) (1984); *Jackson*, 237 Ga. App. at 746-747. Compare *Ellis v. State*, 245 Ga. App. 807, 809 (3) (539 SE2d 184) (2000) (trial court did not err in declining to charge on retreat, where there was no "assertion that [the defendant] could have avoided the confrontation").

Finally, we cannot say that it is highly probable that the failure to give the requested charges did not contribute to the verdict. The evidence against appellant was sufficient but far from overwhelming. Under these circumstances, appellant's convictions of voluntary manslaughter, aggravated assault, and the two related counts of possession of a firearm in the commission of a crime must be reversed, and the case is remanded for a new trial on those counts.[9] See *Koritta*, 263 Ga. at 704-705; *Turner*, 262 Ga. at 360-361 (2) (b); *Stapp v. State*, 273 Ga. App. 899, 903 (616 SE2d 215) (2005).

3. We also will address appellant's remaining enumerations of error that may recur upon retrial in this case.

(a) Prior to trial, appellant gave timely notice pursuant to Uniform Superior Court Rules ("USCR") 31.1 and 31.6 that he intended to present evidence of prior acts of violence committed by the victim against third parties. After appellant testified at trial, appellant attempted to present this evidence. The trial court ruled that appellant had failed to make out a prima facie case of justification and excluded the evidence. Appellant subsequently made a proffer of the testimony of several witnesses concerning prior acts of violence committed by the victim against third parties. Based on the exclusion of this evidence, the state was later able to argue to the jury during summation that "[p]retty much everyone who said [the victim] is crazy is related to [appellant]," thereby suggesting that

---

[9] Appellant's convictions of possession of a firearm in the commission of a crime must be reversed in the light of the reversal of his convictions for the underlying crimes of voluntary manslaughter and aggravated assault. See *Carter*, 265 Ga. App. at 53 (6). In contrast, appellant's conviction of the unlawful possession of a sawed-off shotgun remains intact because the charges on justification and "no duty to retreat" would have no bearing on that offense.

appellant and his family had exaggerated the victim's history of bizarre and violent conduct. On appeal, appellant contends that the trial court erred in excluding the proffered evidence. Again, we agree.

In order to introduce evidence of a victim's prior acts of violence against third parties, the defendant first must (i) make a prima facie showing of justification; (ii) meet the procedural requirements for introducing the evidence; and (iii) establish the existence of the prior acts by competent evidence. *Laster v. State*, 268 Ga. 172, 174 (2) (486 SE2d 153) (1997).

(i) We conclude that appellant made out a prima facie case of justification. To make a prima facie showing of justification, a defendant must present evidence that "the victim was the aggressor, that the victim assaulted him, and that he was honestly seeking to defend himself." (Citation omitted.) *Bryant v. State*, 283 Ga. App. 295, 296 (1) (641 SE2d 277) (2007). Appellant made out the first two elements of a prima facie case based on his testimony at trial that the victim initiated the altercation and attempted to attack him with a knife, threatened to shoot him, and attempted to grab the firearm from him. Likewise, his testimony as previously set out supported a reasonable inference that he was honestly trying to defend himself at the time of the shooting. Consequently, the trial court erred in concluding that appellant had failed to make out a prima facie case of justification.

(ii) The procedural requirements for introducing prior violent acts evidence are set forth in USCR 31.1 and 31.6, which are intended to ensure that the state receives timely and reasonable notice of the defendant's intent to introduce prior violent acts evidence "as well as the nature of [that] evidence." *Watkins v. State*, 264 Ga. 657, 662 (4) (449 SE2d 834) (1994). Substantial, rather than absolute, compliance with the notice requirements is sufficient to pass muster. *Johnson v. State*, 229 Ga. App. 586, 590 (6) (a) (494 SE2d 382) (1997). Appellant's substantial compliance with these requirements, however, is a moot issue in light of our ruling that a new trial is required. Given that appellant made a proffer of the prior violent acts evidence he intended to introduce at trial, it is clear that the state has ample notice long before any retrial of the case that appellant intends to introduce prior violent acts evidence and the specific nature of that evidence.[10]

---

[10] The state contends that there were material inconsistencies between appellant's testimony at trial concerning how the shooting occurred and the summary description of the shooting contained in one paragraph of the notice he submitted pursuant to USCR 31.1 and 31.6. According to the state, these alleged inconsistencies between the description in the notice and appellant's trial testimony were so great as to reduce appellant's USCR 31.1 and 31.6

(iii) Appellant proffered the testimony of four witnesses regarding prior violent acts committed by the victim. Three of the witnesses relied upon their personal knowledge and observations, and so their testimony provided competent evidence. But, one of the proffered witnesses — an officer with the City of Omega Police Department who responded to an incident in which the victim allegedly assaulted one of her relatives — clearly had no personal knowledge of the alleged violent act and instead relied upon what he had been told by the parties at the crime scene. As appellant conceded at the hearing on the motion for new trial, the officer's testimony was hearsay and inadmissible to prove the substance of the prior violent act. See generally *Harris v. State*, 279 Ga. 522, 524-525 (3) (615 SE2d 532) (2005) (the general rule is that an officer cannot testify to hearsay statements in order to show his motive or explain his conduct). Accordingly, upon the retrial of the case, appellant may present the proffered testimony, except for the hearsay testimony of the City of Omega police officer.

(b) In his final enumeration of error, appellant cites to OCGA § 17-8-71 and asserts that the trial court erred in permitting the state to waive its closing argument until after appellant had first made his closing argument.[11] We cannot agree. This Court has addressed the same issue in prior cases and has ruled that the state is entitled to reserve its closing argument until after the defendant's counsel has argued. See *English v. State*, 282 Ga. App. 552, 553 (1) (639 SE2d 551) (2006); *Warren v. State*, 281 Ga. App. 490, 491-493 (2) (636 SE2d 671) (2006).

*Judgment affirmed in part and reversed in part, and case remanded. Ruffin, P. J., and Andrews, J., concur.*

DECIDED MAY 27, 2008 —
RECONSIDERATION DENIED JUNE 26, 2008 —

---

notice "to no notice to the [s]tate" at all. As an initial matter, we have reviewed appellant's notice and compared it to his trial testimony, and while there are some differences between the two, we do not agree that the differences vitiate appellant's notice. Cf. *Joiner v. State*, 265 Ga. App. 395, 398 (3) (b) (593 SE2d 936) (2004) (holding that a "change in the details of a similar transaction witness's testimony" does not invalidate the state's notice of intent to present evidence of similar transactions). In any event, the notice requirements imposed by USCR 31.1 and 31.6 concern the prior conduct of the alleged victim, and the purpose of those requirements is to allow the state an opportunity before trial to investigate the alleged prior acts. See *Johnson*, 229 Ga. App. at 590 (6) (a). The rules do not require that the defendant provide a specific description of his justification defense in the notice itself.

[11] Appellant concedes that this Court lacks jurisdiction to address any constitutional challenge to OCGA § 17-8-71. See *Gearin v. State*, 269 Ga. App. 187, 189 (3) (603 SE2d 709) (2004).

*Perry & Walters, Misty G. Haskins, George P. Donaldson III*, for appellant.

*J. David Miller, District Attorney, Brian A. McDaniel, Assistant District Attorney*, for appellee.