**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER and RAY, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**September 27, 2013**

# In the Court of Appeals of Georgia

A13A0992. OLIVER v. THE STATE.

MILLER, Judge.

Following a jury trial, Jonathan Oliver was convicted of aggravated battery (OCGA § 16-5-24 (a)), aggravated assault (OCGA § 16-5-21 (a) (2)), and cruelty to children (OCGA § 16-5-70 (b)).[1] Oliver appeals from the denial of his motion for a new trial , challenging the sufficiency of the evidence and arguing that he received ineffective assistance from his trial counsel. We discern no error and affirm.

> On appeal from a criminal conviction, the evidence must be viewed in the light most favorable to support the verdict, and the defendant no longer enjoys a presumption of innocence. We determine only whether the evidence authorized the jury to find the defendant guilty beyond a reasonable doubt, and in doing so we neither weigh the evidence nor judge the credibility of witnesses.

---

[1] The jury found Oliver guilty on two counts of aggravated battery, Counts 1 and 2 of the indictment. The trial court merged Count 2 into Count 1.

(Citation omitted.) *Bryant v. State*, 320 Ga. App. 838 (740 SE2d 772) (2013).

So viewed, the evidence shows that Oliver and Brittany Lee have a daughter together. On March 4, 2010, Lee left their two-year old daughter and Lee's seven-month old son, J. L., in Oliver's care at Oliver's mother's house. According to Lee, J. L. was acting normal when she left him, and she had observed no bruises or bite marks on his body when she dressed him the previous evening. Lee spoke with Oliver around 11 a.m., and he told her that J. L. had fallen and hit his face on the fireplace. Later in the day, Lee received a call from an investigator, who told her to come to the house right away. Lee spoke with Oliver's mother, who told her that J. L. was being airlifted to Memorial Health University Medical Center in Savannah. Lee then spoke with Oliver, and he told her that J. L. slipped under the water in the bathtub and stopped breathing.

Brian Shearouse, a Deputy Sheriff with the Effingham County Sheriff's Department, was one of the first responders to arrive at Lee's residence in response to a 911 call concerning the possible drowning of a child. When he arrived, he found J. L. lying on a counter wearing only a diaper. He observed that J. L. had begun to turn blue from below his nose to his chin. Shearouse could detect J. L.'s heartbeat,

2

but the child was not breathing. After checking for any obstruction in J. L.'s airway, Shearouse administered rescue breaths until paramedics arrived. During this time, Shearouse observed occasional spontaneous breaths, but J. L. was otherwise motionless and unresponsive. Shearouse overheard Oliver say that he was giving J. L. a bath when J. L. slipped under the water. When Shearouse ran his hand over J. L.'s hair, it was dry to the touch.

Oliver initially told law enforcement officers that he was bathing J. L. and sitting in the bathtub holding J. L. in his lap when J. L. slipped from his grasp and his face slipped under the water for approximately two seconds. Oliver also stated that when he got J. L. out of the bath, J. L. became stiff and stopped breathing. Oliver stated that he panicked and ran for the phone, leaving J. L. on the counter, and started CPR while he called 911. Oliver subsequently told police that a few hours before his bath, J. L. had fallen while trying to pull himself up on the fireplace hearth and bruised his cheek. Oliver also added that he had collapsed with J. L. in his arms while carrying J. L. from the bedroom to the kitchen after J. L. stopped breathing. In a subsequent interview at the hospital, Oliver stated that earlier in the day J. L. might have struck his head on the underside of a coffee table while attempting to stand. At the conclusion of the interview at the hospital, Oliver was placed under arrest. In a

3

post-arrest interview, Oliver stated that he had forgotten to tell other investigators that J. L. also had fallen off the bed that day.

Dr. Thomas McKee, the pediatric intensive care doctor who treated J. L. during the first 24 hours of his hospitalization in Savannah, testified that a CT scan showed a skull fracture on the right side of J. L.'s head and a subdural hematoma. Due to his head injuries, J. L. was comatose and needed medication to support his blood pressure. Dr. McKee observed bruises on J. L.'s face and a mark on his back that appeared to be a human bite mark. Dr. McKee testified that J. L.'s injuries resulted from severe trauma and were not consistent with the history provided by Oliver. Dr. McKee stated that the type of force that would cause J. L.'s injuries would be a "purposeful injury from a larger individual, an adult, or a high speed automobile accident, or a fall from a second story window, something of that nature."

Dr. Donna Evans, the Medical Director of the Child Protection Team at Memorial, consulted on J. L.'s case. Dr. Evans testified that the bruises on J. L.'s face could not have occurred from a single fall on a fireplace hearth. Dr. Evans testified that injuries as serious as J. L.'s would require emergency medical intervention shortly after they occurred. Dr. Evans stated that J. L. suffered inflicted trauma to the face, a skull fracture, and tearing of the bridging veins in the brain. In her opinion, J.

L. was "traumatized, brutalized [and] suffered a final blow to the head, which cracked the skull."

Lee testified that following J. L.'s injuries and hospitalization in March 2010, he had no voluntary movement, was fed through a tube in his stomach, and required daily breathing treatments and occasional deep suctioning of the lungs.

1. Oliver contends that the evidence was insufficient to support his convictions because Dr. Evans performed an inadequate review of the facts and records. These issues went to the weight and credibility of her testimony, which was for the jury to decide. See *Lewis v. State*, 292 Ga. App. 257, 262 (1) (a) (663 SE2d 721) (2008). Further, the State also presented, among other evidence, the testimony of Dr. McKee, who opined that J. L.'s injuries resulted from severe trauma and were not consistent with the history provided by Oliver, and evidence concerning Oliver's evolving account of the events on the day J. L. was injured while under Oliver's sole supervision. We conclude that the evidence was sufficient for the jury to conclude that J. L.'s injuries were not accidental and to find Oliver guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307 (99 S Ct 2781, 61 LE2d 560) (1979).

2. Oliver argues that he received ineffective assistance from his trial counsel because his trial counsel failed to conduct a reasonable investigation into the medical evidence regarding J. L's injuries or to retain medical experts to rebut the testimony of the State's medical experts. We disagree.

"To establish an ineffective assistance of counsel claim, the defendant must show that counsel's performance was deficient and the deficient performance prejudiced the defense. There is a strong presumption that counsel's conduct falls within the range of sound trial strategy and reasonable professional judgment." (Citations omitted.) *Bright v. State*, 292 Ga. 273, 274 (2) (736 SE2d 380) (2013). "[W]here trial counsel does not testify at the motion for new trial hearing, it is extremely difficult to overcome the presumption that counsel's conduct resulted from reasonable trial strategy." (Citation and punctuation omitted.) *Brown v. State*, 288 Ga. 902, 908 (5) (708 SE2d 294) (2011); *Bass v. State*, 309 Ga. App. 601, 606 (3) (710 SE2d 818) (2011). In reviewing a trial court's ruling on an ineffective assistance claim, "we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." (Citations and punctuation omitted.) *Holloman v. State*, 293 Ga. 151, 154 (4) (744 SE2d 59) (2013).

At the hearing on Oliver's motion for new trial, Oliver called two expert witnesses. Dr. Roger McClendon, Chief of Neuropathology and Chief of Surgical Pathology at Duke University Medical School, testified that the CT scan of J. L.'s head revealed not only an acute subdural hematoma but also a chronic subdural hematoma that was at least three weeks old and apparently had caused an accumulation of cerebral spinal fluid around the brain. In Dr. McClendon's opinion, this type of prior brain injury would make someone more susceptible to an acute subdural hematoma. Dr. McClendon admitted, however, that he could not testify that J. L.'s injuries were not intentionally inflicted.

Dr. Michael R. Papciak, an Atlanta pediatrician, testified that J. L. was developmentally delayed, had reduced muscle tone, and had episodes of stopping breathing and possible seizures at three weeks and five months of age. Dr. Papciak stated that when CPR is performed on a child, a mask is placed on the face, which can result in bruising. Like Dr. McClendon, Dr. Papciak testified that the CT scan of J. L.'s head revealed fluid consistent with an older brain injury and that such an injury would have made the brain more susceptible to bleeding. Dr. Papciak concluded that Oliver's fall while holding J. L. and "everything else I described about the child" were "possible or probable reasons" for J. L.'s injuries. Dr. Papciak testified that

7

Oliver told him that when he fell with J. L. while running to call 911, his body landed on top of the child. Dr. Evans testified at trial, however, that Oliver told her that he fell to his knees and hit his elbows and J. L. then rolled out of his arms.

While he presented expert testimony, Oliver did not subpoena his trial counsel to testify at the motion for new trial hearing. Thus, the only relevant statement by trial counsel in the record is the following statement at trial:

> Judge, the only other thing that I would place on the record is the fact that when we received this case, I submitted this medical evidence, all of it, to a physician to use as a possible expert witness in the case. However, for trial tactical reasons, we did not call that expert. I just wanted the record to indicate that.

Decisions regarding

> how to deal with the presentation of an expert witness by the opposing side, including whether to present counter expert testimony, to rely upon cross-examination, to forego cross-examination and/or to forego development of certain expert opinion, is a matter of trial strategy which, if reasonable, cannot be the basis for a successful ineffective assistance of counsel claim.

(Citation and punctuation omitted.) *Brown v. State*, 292 Ga. 454, 456-457 (2) (738 SE2d 591) (2013) (trial counsel not deficient for discontinuing search for expert after trauma nurse and physician she consulted both expressed doubts about theory that child's initial brain injury was accidental); *Gawlak v. State*, 310 Ga. App. 757, 759

8

(2) (a) (714 SE2d 354) (2011) (trial counsel's decision to forego presentation of counter expert testimony regarding child interview techniques and typical behavior of molested children was strategic, and appellant failed to prove decision was unreasonable). The record here reflects that Oliver's trial counsel dealt with the State's experts by cross-examining them. Trial counsel cross-examined Dr. McKee about the significance of J. L.'s prior lung problems, the possibility of a prior skull fracture, and whether accidental falls could cause a skull fracture. Trial counsel raised similar issues with Dr. Evans and also questioned her regarding, inter alia, her inability to specify the exact age of J. L.'s bruises and her history of being called to testify by the prosecution.

Without his counsel's testimony at the motion for new trial hearing, Oliver could not rebut trial counsel's statement that the decision not to utilize an expert witness was strategic. Additionally, Oliver could not overcome the strong presumption that trial counsel's investigation into the medical evidence and decisions regarding how to deal with the State's experts fell within the range of sound trial strategy and reasonable professional judgment. See *Bass*, supra, 309 Ga. App. at 607 (3) (c) (appellant failed to establish that his counsel was deficient in failing to employ

9

expert when he did not call trial counsel to testify at motion for new trial hearing); *Nichols v. State*, 253 Ga. App. 512, 515-516 (2) (559 SE2d 538) (2002) (without trial counsel's testimony at hearing on motion to withdraw guilty plea, this Court must presume that trial counsel's decisions concerning psychological testing of appellant and pursuit of a medical defense were strategic and not deficient). Given that Oliver failed to establish that his trial counsel's performance was deficient, the trial court did not err in rejecting Oliver's ineffective assistance of counsel claim.

*Judgment affirmed. Barnes, P. J., and Ray, J., concur.*